# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALMA I. PEREZ, On Behalf of Herself And All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>vs.<br><br>TEXTRON, INC., TERRENCE O'DONNELL, DOUGLAS STEWART, NANCY GILMAN, LEWIS B. CAMPBELL, KATHLEEN BADER, IVOR J. EVANS, LAWRENCE K. FISH, JOE T. FORD, PAUL E. GAGNE, DAIN M. HANCOCK, LORD POWELL OF BAYSWATER KCMG, LLOYD G. TROTTER, THOMAS B. WHEELER, JAMES L. ZIEMER and JOHN DOES 1-20,<br><br>                   Defendants. | **CA09- 424M**<br><br>Civil Action No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alma I. Perez ("Plaintiff"), individually and on behalf of all other persons similarly situated, alleges as follows:

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3), on behalf of the Textron Savings Plan (the "Plan") against the Plan's fiduciaries.

2.     Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to the Plan and the Plan's participants and beneficiaries in violation of ERISA, particularly with regard to the Plan's holdings of Textron common stock, which Defendants knew or should have known was an imprudent investment alternative for the Plan.

3.     This action seeks relief on behalf of the Plan, for losses to the Plan, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109,

and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

4.      Plaintiff's claims apply to the participants and beneficiaries of the Plan as a whole. ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan. Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan between January 18, 2007 and January 29, 2009 (the "Class Period").

## JURISDICTION AND VENUE

5.      **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.      **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). As all Defendants are either residents of the United States or subject to service in United States, this Court has personal jurisdiction over them.

7.      **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, the Company is headquartered in this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

## PARTIES

### Plaintiff

8.      Plaintiff Alma I. Perez is a resident of Palmdale, California. She is a participant in the Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a). During the Class Period, the Plan purchased or maintained units of the Textron Stock Fund for Plaintiff Perez's individual plan account.

**Defendants**

9.     **Defendant Textron** is a Delaware corporation, with its principal executive offices located at 40 Westminster Street, Providence, Rhode Island.   Textron manages its operations through five business segments:   the Cessna segment (the "Cessna Segment"), operating primarily through the Cessna Aircraft Company ("Cessna Aircraft"), which manufactures piston, turbo and business jets; the Bell segment (the "Bell Segment"), which manufactures and markets Bell helicopters for military and commercial applications; Textron Systems Group, which develops and markets products to the defense market; the Industrial Segment, which manufactures a number of linked product lines for the leisure/resort/golf industry and automotive industry; and the Finance segment (the "Finance Segment"),   which participates in the financial services markets through Textron's subsidiary, Textron Financial Corporation ("TFC").   The Company was founded in 1923 and, as of January 3, 2009, had approximately 43,000 employees.

10.     Upon information and belief, Textron, at all times, acted through its officers, directors and employees, and members of committees who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

11.     During the Class Period, Textron was a fiduciary of the Plan in that it had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.   Through the Board of Directors of Textron (the "Board"), or otherwise, Textron had the authority and discretion to hire and terminate said officers and employees.   Textron also had the authority and discretion to appoint, monitor and remove officers, directors and employees who performed fiduciary functions with respect to the Plan.   The actions of the Company's officers, directors, and other employee

fiduciaries are imputed to Textron under the doctrine of *respondeat superior,* and Textron is liable for these actions.

**Administrator Defendants**

12.     **Defendant Terrence O'Donnell ("O'Donnell")** served as an Executive Vice President and General Counsel of Textron during the Class Period.  Defendant O'Donnell signed the Plan's Form 11-K Annual report for the fiscal year ended, December 31, 2006, which was filed with the U.S. Securities and Exchange Commission ("SEC") on or about June 28, 2007 (the "2006 11-K"), the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2007, which was filed with the SEC on or about June 26, 2008 (the "2007 11-K"), and the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2008, which was filed with the SEC on or about June 26, 2009 (the "2008 11-K"), as Plan Administrator for the Textron Savings Plan.  Defendant O'Donnell was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to management and administration of the Plan and/or the management and disposition of the Plan's assets.

13.     **Defendant Douglas Stewart ("Stewart")** served as a Human Resources Compliance Officer for the Company.  Defendant Stewart signed the Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan for fiscal year 2007, dated on October 16, 2008 (the "2007 5500"), on behalf of the plan sponsor and signed the Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan for fiscal year 2007, dated December 6, 2007 (the "2006 5500"), in his capacity as the "plan administrator" and on behalf of the plan sponsor.  Defendant Stewart was a Plan fiduciary during the Class Period within the meaning of ERISA in that, he exercised discretionary authority with respect to with respect to management and administration of the Plan and/or the management and disposition of the Plan's assets.

14.    **Defendant Nancy Gilman ("Gilman")** Defendant Gilman ("Gilman") was the plan administrator at times during the Class Period.  She signed the 2007 5500 in her capacity as the "plan administrator."  Defendant Gilman was a Plan fiduciary during the Class Period within the meaning of ERISA, in that she exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

**Board Defendants**

15.    **Defendant Lewis B. Campbell ("Campbell")** was the Chief Executive Officer ("CEO") and Chairman of the Board of Textron during the Class Period. Defendant Campbell was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

16.    **Defendant Kathleen Bader ("Bader")** served as a member of the Board during the Class Period.  Defendant Bader was a Plan fiduciary during the Class Period within the meaning of ERISA, in that she exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

17.    **R. Kerry Clark ("Clark")** served as a member of the Board during the Class Period.  Defendant Clark was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

18.    **Defendant Ivor J. Evans ("Evans")** served as a member of the Board during the Class Period.  Defendant Evans was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

19.     **Defendant Lawrence K. Fish ("Fish")** served as a member of the Board during the Class Period.  Defendant Fish was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

20.     **Defendant Joe T. Ford ("Ford")** served as a member of the Board during the Class Period.  Defendant Ford was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

21.     **Defendant Paul E. Gagne ("Gagne")** served as a member of the Board during the Class Period.  Defendant Gagne was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

22.     **Defendant Dain M. Hancock ("Hancock")** served as a member of the Board during the Class Period.  Defendant Hancock was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

23.     **Defendant Lord Powell of Bayswater KCMG ("Powell")** served as a member of the Board during the Class Period.  Defendant Powell was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

24.     **Defendant Lloyd G. Trotter ("Trotter")** served as a member of the Board during the Class Period.  Defendant Ford was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

25.     **Defendant Thomas B. Wheeler ("Wheeler")** served as a member of the Board during the Class Period.  Defendant Wheeler was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

26.     **Defendant James L. Ziemer ("Ziemer")** served as a member of the Board during the Class Period.  Defendant Ziemer was a Plan fiduciary during the Class Period within the meaning of ERISA, in that he exercised discretionary authority with respect to the management and administration of the Plan and/or the management and disposition of the Plan's assets.

27.     **Defendants John Does 1-20** are additional Textron officers, directors, employees, and members of any Board committees, subcommittees or other Textron committees, who were fiduciaries of the Plan during the Class Period, and whose identities are presently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

### THE PLAN

28.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

29.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action Plaintiff seeks plan-wide relief.

30.     The Plan covers all eligible domestic employees of Textron.

31.     Textron employees are subject to automatic enrollment on the 60th day after their date of hire, if they have not specifically elected to be excluded from the Plan.

32.     According to the 2008 11-K, participants of the Plan are entitled to elect compensation deferrals up to 40% of their eligible compensation, within limits of the Internal Revenue Code.  Participants' pre-tax and after-tax contributions are matched to a maximum of 50% up to 5% of eligible compensation.  Certain participants in the Plan are entitled to receive a retirement supplement contribution which is equal to 1% of the participant's eligible compensation.  Contributions from employees who receive a retirement supplement are matched 100% up to 4% of eligible salary by Textron, subject to certain ERISA restrictions and plan limits.

33.     Participants of the Plan may elect to direct their employee contributions to any of the Investment Options offered by the Plan.  One of the Investment options is the Textron Stock Fund and it consists solely of Textron common stock.

34.     Employer matching contributions are invested entirely in the Textron Stock Fund. Employees have the ability to subsequently reallocate matching contributions among any of the investment options offered by the Plan.

35.     According to the 2008 11-K, the portion of the Plan that invests in the Textron Stock Fund is an employee stock ownership plan (ESOP) and the remainder of the Plan is a profit-sharing 401(k) plan.

36.     Although the Plan includes a purported ESOP component, upon information and belief, the Plan does not satisfy all the statutory and regulatory mandates with respect to ESOP design and/or operation.   Furthermore, the purported ESOP component does not relieve Defendants from their fiduciary duties under ERISA.

37.     According to the 2008 11-K, for fiscal year 2008, the Plan held $389.2 million worth of Textron common stock, or 28% of total Plan assets, at the end of the 2008.  According to the Form 11-K filed with the SEC for fiscal year 2007, the Plan held approximately $1.6 billion worth of Textron common stock, or 54% of total Plan assets, at the end of the 2007. According to the Form 11-K filed with the SEC for fiscal year 2006, the Plan held $1.17 billion worth of Textron common stock, or 49% of total Plan assets, at the end of the 2006.

38.     Defendants, as Plan fiduciaries, were required by ERISA to furnish information to Plan Participants.   ERISA § 101, 29 U.S.C. § 1021, requires the Plan administrator to furnish Summary Plan Descriptions (SPDs) to Participants.   Upon information and belief, the Plan's SPD in effect during the Class Period incorporates by reference certain information filed with the SEC by the Company, including but not limited to, the Company's Annual Report on Form 10-K for it most recently ended fiscal year, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, Registration Statements, and the Plan's Annual Report on Form 11-K, rendering communications contained in such filings with the SEC fiduciary communications with Plan participants and beneficiaries.

39.     The trustee and recordkeeper of the Plan is Fidelity Management Trust Company.

### DEFENDANTS' FIDUCIARY STATUS

40.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.

41.     ***Named Fiduciaries.***  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  Upon information and belief, Defendants O'Donnell, Stewart and Gilman were named fiduciaries of the Plan during the Class Period.

42.     ***De Facto Fiduciaries.***  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C.  § 1002(21)(A)(i).  During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

43.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

44.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Textron chose to internalize at least some of these fiduciary functions.

45.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

**Textron**

46.     Upon information and belief, under the terms of the Plan, Textron was given direct control and management over any aspect of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan, and upon information and belief, exercised this control.

47.     As a matter of corporate law, Textron was imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to Textron.

48.     Upon information and belief, Textron exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard, Textron drafted and disseminated various documents and materials related to the Plan, including but not limited to, the summary plan descriptions and the documents incorporated into the summary plan descriptions.  Based on the allegations contained herein, Textron was a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised

11

discretionary authority and control with respect to the appointment of other Plan fiduciaries during the Class Period.

49.     Textron was a Plan fiduciary to the extent it exercised its authority to select, monitor, retain, and remove the Administrator Defendants and members of any committees or other individuals charged with the administration of the Plan and, accordingly, exercised authority and oversight over the Administrator Defendants and such committees, which reported to the Board regarding their fiduciary duties and responsibilities to the Plan and with respect to their actions pertaining to the same.

**Administrator Defendants**

50.     Upon information and belief, Defendants O'Donnell, Stewart and Gilman, at such times during the Class Period during which each was a Plan Administrator, were charged with designating investment funds for the Plan, establishing rules and procedures with respect to the Plan's investment funds and monitoring the performance of the Plan's investments.   Upon information and belief, the Administrator Defendants were appointed by the Board.   Upon information and belief, the Administrator Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

51.     Upon information and belief, the Plan and its assets are administered and managed by the Administrator Defendants, selected and monitored by the Board.   Upon information and belief the Administrator Defendants exercised broad responsibility for management and administration of the Plan and, among their other duties, were responsible for oversight of the Plan's investment options, policies, and the performance of the Plan's investments, as well as the review of investment managers.

52.     Upon information and belief, in their capacity to select and monitor investment options for the Plan, the Administrator Defendants had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in Textron stock.   Upon information and belief, the Administrator Defendants regularly exercised their authority to suspend, eliminate, reduce, or restructure the Plan's investments. The Administrator Defendants also reported to the Board regarding these duties.

53.     Upon information and belief, the Administrator Defendants exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.  In this regard, on behalf of Textron, the Administrator Defendants disseminated Plan documents and materials.

**Director Defendants**

54.     Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Bayswater, Trotter, Wheeler and Ziemer, as members of the Board, had the authority and discretion to appoint, hire, monitor and/or remove the designated Plan Administrator(s), as well as other officers and employees appointed by the Company to perform Plan-related fiduciary functions.  Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Bayswater, Trotter, Wheeler and Ziemer thus were fiduciaries of the Plan, in that they exercised discretionary authority with respect to the management of the Plan and/or management and disposition of the Plan's assets.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, i.e., between January 18, 2007 and January 29, 2009 whose accounts included investments in Textron common stock.

56.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Plan participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

58.     Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

61.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FACTS BEARING ON DEFENDANTS' FIDUCIARY BREACHES

62.     By the beginning of the Class Period, Textron was attempting to deflect attention away from a number of setbacks, including problems relating to its Bell Segment's governmental helicopter projects and a "payment for profit" scheme involving the United Nation's Food-For-Oil Program in Iraq.  In that regard, Textron attempted to create a positive tenor and focused on growing its Cessna Segment.  Textron accepted orders for business jets from a growing number of customers.  However, many of these customers never intended to take delivery of aircraft or did not have the financial resources to do so because they were mere startups and/or financially

distressed fleet operators.  This practice materially inflated Textron's "backlog" of unfilled orders for the Cessna Segment, which in turn materially overstated the Company's financial condition and future prospects.  For example, hundreds of orders reported as "backlog" at the Cessna Segment for future business-jet production were subject to deferral and cancellation. Backlog is an indicator of future revenue and a critical metric to ascertain growth.  According to the Company's SEC Form 10-K for the year ended December 31, 2008, the Cessna Segment accounted for 40% of Textron's total revenues.

63.     On January 18, 2007, the first day of the Class Period, Textron filed a Form 8-K with the SEC, with a press release as an exhibit entitled "Textron Comments on Fourth Quarter 2006 Earnings Outlook."  The press release stated, in pertinent part, that the Company "has incurred additional costs related to its Bell Helicopter H-1 program during the fourth quarter of 2006.  However, *stronger financial performance at Cessna*, Textron Systems and Textron Financial, plus a lower tax rate, more than offset the additional H-1 costs booked in the quarter. This will result in reported fourth quarter earnings per share from continuing operations in excess of the company's previous guidance range of $1.35 - $1.45." (emphasis added).

64.     The market's enthusiasm about Textron was highly dependent on Textron's Cessna Segment and its backlog.  According to a March 19, 2007 article in Barron's:

> Its backlog alone provides a lot of thrust for Textron shares . . . Since the king of go-go era conglomerates began narrowing its focus to jets and helicopters under chief executive Lewis Campbell, demand for flying machines has gone Textron's way . . . Thanks largely to the Bell and the Cessna aircraft units, Textron's backlog at year-end 2006 hit a record $13.4 billion.  About $8.5 billion was for Cessna, impressive for a business with just under $4.2 billion in sales last year…If Textron has truly risen above the previous problems of its military-helicopter programs, there's no reason why its shares shouldn't fly.

*See* Bill Alpert, *Finally Airborne and Ready to Soar*, Barron's, Mar. 19, 2007.

65.     The price of Textron stock at this time was approximately $43 per share (adjusted for stock split discussed below).

66.     On April 19, 2007, the Company filed a Form 8-K with the SEC with a press release attached as an exhibit entitled "Textron Delivers Strong First Quarter Results; Reports EPS from Continuing Operations of $1.55 compared to $1.19 a Year Ago; Books 122 New Business Jet Orders; Increases 2007 Expected EPS from Continuing Operations Range by $0.20." The press release stated in relevant part as follows:

> Textron Inc. (NYSE: TXT) today reported a 30% increase in earnings per share from continuing operations on a 12.6% revenue increase. The company also raised earnings guidance for 2007, reflecting continued expectations of solid top-line growth and strong operational performance.
>
> "We outperformed again this quarter with strong organic revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell. "Demand for our products and further improvements in enterprise management continue to drive enhanced results", Campbell added . . . . Revenues at Cessna increased $99 million primarily due to Citation business jet mix and favorable pricing . . . .Cessna's backlog increased to $9.0 billion at the end of the first quarter from $8.5 billion at the end of last year.

67.     The price of Textron stock at this time was approximately $48 per share.

68.     On July 19, 2007, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2007.  The Company reported revenues of $3.2 billion, up 15% from 2006, with income from continuing operations of $1.69 per share, compared to $1.34 in the second quarter of 2006.  Textron reported that the Bell Segment's profits declined due to a $48 million charge on a helicopter program for the U.S. military.  The Company reported higher profits in both its Cessna Segment and Finance Segment, and reported that the Cessna Segment's backlog had increased to $10.4 billion at the end of the second quarter of 2007, compared to $9.0 billion for the prior quarter.  The Finance Segment's revenues and

profits increased compared to the prior year due in part to "higher average finance receivables." The Company also announced Board approval of a two-for-one stock split of its common stock shares. Defendant Campbell commented on the strong demand for Textron's products, stating in pertinent part as follows:

> Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year.
>
> Textron expects full-year 2007 revenues will be up about 12% from last year, while earnings per share from continuing operations are now expected to be between $6.35 and $6.55, $0.25 per share higher than its previous guidance. Third quarter earnings per share from continuing operations are expected to be between $1.45 and $1.55. The company now expects full-year 2007 free cash flow to be in the range of $550 - $600 million, up $50 million from its previous expectation.

69.     The price of Textron stock at this time was approximately $58 per share.

70.     On or about August 23, 2007, the SEC filed Foreign Corrupt Practice Act charges against Textron for improper payments to Iraq under the U.N. Oil-For-Food Program. The Company agreed to pay the SEC more than $3.5 million in penalties and fines to settle the charges and paid additional fines of $1.15 million pursuant to a non-prosecution agreement with the U.S. Department of Justice, Fraud Section.

71.     On October 18, 2007, the Company filed a Form 8-K with the SEC, attaching as an exhibit thereto a press release entitled "Textron Reports Strong Third Quarter Results on 15% Year-Over-Year Revenue Growth; EPS from Continuing Operations of $0.95 Compared to $0.68 a Year Ago; Increases Expected 2007 EPS from Continuing Operations Range by $0.22 and Free Cash Flow by $50 Million Books 609 New Business Jet Orders to Date." The press release reported that Cessna's backlog had reached an "all-time high of $11.9 billion." The Finance Segment reported higher earnings due in part to a "decrease in the provision for [loan] losses."

Defendant Campbell commented on Textron's "strong" third quarter results stating in pertinent part as follows:

> "Once again, we delivered an excellent quarter with strong organic revenue growth and improved profitability," . . . . "Our sustained strong operating performance allowed us to exceed our financial targets while continuing to invest in our longer-term growth." . . . . "We see strong end-market demand continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy, positions us to deliver significant growth in earnings, cash flow and shareholder value."

72.   The price of Textron stock at this time was approximately $64 per share and climbed to approximately $70 per share by the end of 2008.

On January 24, 2008, the Company filed a Form 8-K with the SEC announcing its financial results for the fourth quarter ended December 29, 2007. The accompanying press release was entitled "Textron Reports 32 Percent Increase in Fourth Quarter Earnings Per Share on 18 Percent Revenue Growth; Reports EPS from Continuing Operations of $1.02 compared to $0.77 a Year Ago; Books 164 New Business Jet Orders During Fourth Quarter; Sets New Record with 773 Jet Orders in 2007; Announces Approval of Large Cabin Citation Jet; Expects 2008 EPS from Continuing Operations Range of $3.75 to $3.95; Up from $3.59 in 2007," In the press release, Defendant Campbell assured investors that its underwriting and backlog were sound. The press release further stated, "Our fourth quarter culminates a year of powerful performance at Textron on many fronts. The positive impact of our ongoing journey to become the premier multi-industry company is apparent in our top-line growth and our ability to convert that growth into profits and premium shareholder returns."

73.   Textron also issued earnings guidance for 2008, predicting an increase in revenues of about $15 billion, up 13%. Defendant Campbell stated:

> While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, *we believe we are particularly well*

> *positioned given our strong aircraft and military backlogs and
> history of prudent underwriting at Textron Financial.*
>
> Even with the softer U.S. economy, we expect another banner year
> of business jet orders exceeding current year deliveries. Given that
> our jet backlog already extends well into 2009, this bodes well for
> continued, uninterrupted growth well into the next decade at
> Textron.

(Emphasis added.)

74.    While shares of Textron fell by 20% in January, analysts and the market held out

hope for Textron based again on Textron's purported backlog in the Cessna and Bell segments:

"Yet the combined backlog at Bell, Cessna and Textron Systems had grown from $12.9 billion in

2006 to $18.8 billion at the end of last year-- and that measure of certainty should help Textron

in this uncertain market.  Textron also benefits from the weak dollar and increasingly global

demand for business jets and airplane equipment.  *Cessna, for example, is nearly sold out of*

*business jets through 2009 . . . ." See The Trader:  The Bull Stampedes, but Buyers Worry*, by

Kopin Chan, Barron's Feb. 4, 2008.

75.    On April 17, 2008, Textron announced its financial results for the first quarter

ended March 29, 2008.  The Company reported earnings of $0.93 per share, exceeding the high

end of Textron's guidance range by $0.08, up 19% compared to the previous year.  The Cessna

Segment reported 235 new business jet orders, bringing its backlog to $14.5 billion, up $1.9

billion from year end 2007.  Textron reported lower profits in its Finance Segment due to an

increase in the provision for loan losses, primarily in the asset-based lending and distribution

finance businesses.  Textron increased its forecast for 2008 earnings by $0.05 per share to a

range of $3.80 and $4.00.  The Company's second quarter 2008 earning were expected to be

between $0.90 and $1.00 per share.  Defendant Campbell again commented on the strong

demand in Textron's aircraft and defense businesses, stating:

> Global demand continues to be brisk across our aircraft and
> defense businesses, which led to another significant expansion in
> our backlog during the quarter…We also had strong performance
> in our manufacturing operations, which is important as we expand
> our capacity to meet growing requirements for our products and
> services.

76.     On June 13, 2008, the Company filed a Form 8-K with the SEC.  The June 13,

2008, Form 8-K contained as an exhibit a press release that, among other things, announced that

Textron would lower its earnings forecast for the second quarter of 2008 because of significantly

lower Finance Segment results. The press release stated in pertinent part as follows:

> Textron Inc. (NYSE: TXT) reported today that it now expects
> 2008 second quarter earnings per share from continuing operations
> to be in the range of $0.93 to $0.98, compared to its previous
> forecast of $0.90 to $1.00. The company continues to forecast full-
> year earnings per share from continuing operations in the range of
> $3.80 to $4.00 and free cash flow of $700 - $750 million.
>
> The company said that profit in its Finance segment would be
> significantly less than previously forecast. Lower profitability in
> Finance will result from higher second quarter pre-tax loan loss
> provisions of about $20 million and a pre-tax charge of about $10
> million that will be recorded in the quarter related to Sale-In,
> Lease-Out (SILO) transactions previously challenged by the IRS.
> Weaker profit at Finance in the second quarter and for the full-year
> is expected to be offset primarily by higher profits in the aircraft
> and defense businesses.
>
> "Despite further softening in our commercial finance business,
> 2008 is shaping up to be another very good year for Textron
> overall as we continue to see strong demand and performance at
> Cessna, Bell Helicopter and Textron Systems," said Textron
> Chairman, President and CEO Lewis B. Campbell.

77.     The next trading day, June 16, 2008, Textron stock dropped by approximately

6.5% to close at $54 per share.

78.     On July 17, 2008, Textron issued a press release announcing its financial results

for the second quarter ended June 28, 2008.  The Company reported earnings of $1.03 per share

exceeding guidance by $0.05 per share.  The Cessna Segment reported 437 new business jet

orders for the first half of 2008, bringing its backlog to $16.0 billion.  The Finance Segment reported lower profits due to the previously announced loan losses.  Defendant Campbell commented stating in pertinent part as follows:

> We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong and led to another record level of backlog," said Textron Chairman, President and CEO Lewis B. Campbell. "Likewise, we had double-digit organic growth at E-Z-GO, where our new golf car has been well received, and Fluid & Power where our energy-related products are in high demand," Campbell added.

79.    Following the announcement, the stock price of Textron declined by more than 5%.

80.    In September 2008 analysts, such as Gabelli & Co., began downgrading Textron in advance of its third quarter earning release, scheduled to occur on October 16, 2008. According to a September 17, 2008, Reuters News article "Debt protection costs on the finance arms of industrial companies . . . have surged at a faster pace than the general market in the past month which may foretell problems for the companies.  The financing arm of Textron…[has seen its] credit default swap levels just my more than 200 percent in the period . . . .  Debt protection costs on Textron Finance Corp. also jumped 24 percent on Wednesday to 277.5 basis points, Markit data shows."  *See* Karen Brettell, *US Credit-GE, Caterpillar CDS spreads may presage problem.*

81.    On or about September 16, 2008, analysts at thestreet.com downgraded Textron stock, observing "weaknesses including poor profit margins, a generally disappointing performance in the stock itself and generally poor debt management."

82.    On September 17, 2008, Textron stock fell $3.31 per share, nearly 10%, to close at $31.51.

83.     The Company's stock price declined heavily by nearly $5.00 per share after a Reuters report on September 26, 2008, noted that the consensus earnings for Textron were $0.89, down six cents from the third quarter of the prior year.

84.     Textron closed at $27.50 per share, down 16.5% from its open of $32.95 per share on September 26, 2008.

85.     On October 16, 2008, Textron filed its Form 8-K, which contained as an exhibit a press release entitled "Textron Reports Third Quarter EPS from Continuing Operations of $0.85; Strategic Actions Announced, Led by TFC Downsizing Maintains Record Aircraft & Defense Backlog."

86.     The press release accompanying the Company's October 16, 2008 Form 8-K confirmed various analyst downgrades, and announced the following "Strategic Actions:"

> Given the sustained turmoil in world credit markets we are taking a number of strong and measured steps, including:
>
> > -a downsizing of Textron Financial Corporation (TFC),
> >
> > -a strengthening of our already strong capital and liquidity positions,
> >
> > -and an accelerated cost reduction program across the company.

87.     The October 16, 2008, Form 8-K also announced that Textron slashed its 2008 EPS guidance from $3.80 to $4.00 per share to $3.55 to $3.65 per share due to its Finance Segment and announced plans to sell its securitization business, leading to losses of $169 million in goodwill and $25 million in "restructuring charges."

88.     In response, analysts downgraded Textron.  Following the announcement, the price of Textron stock fell 17% to $15.52 per share.

89.    On December 22, 2008, Textron announced that the Board had approved plans to exit the Finance Segment's commercial lending activities except for "captive financing" activities related to sales in the Company's manufacturing segments.  Approximately $7.9 billion of the Finance Segment's $11.4 billion total financial assets were put on the blocks for "orderly liquidation" or "selective sales."   Textron belatedly reported that $3.5 billion of the Finance Segment's "managed receivables," $1.5 billion of which were sold to investors through securitizations, had degraded in value resulting in prospective fourth quarter 2008 pre-tax charges of $250-$300 million, requiring Textron to inject $600 million in capital to the Finance Segments under an existing support agreement.  The Company also announced further workforce reductions resulting from production cutbacks, bringing total estimated restructuring costs to $65 million.

90.    The following day, Textron stock declined $3.14, or 20%, to close at $12.20.

91.    Fitch's commented on Textron's precarious capital condition:  "Although Fitch is anticipating that cashflow generated from manufacturing businesses and asset sales and portfolio amortization from TFC will be sufficient to satisfy near-term debt and contractual funding obligations, challenging economic and market conditions may preclude TFC's ability to generate sufficient liquidity via these sources and require the company to pursue more costly funding alternatives." *See Fitch Downgrades Textron's IDR to 'BBB+'; Outlook Negative*, December 23, 2008.

92.    On January 29, 2009, the last day of the Class Period,  the Company issued a press release entitled "Textron Reports Fourth Quarter and Full-Year Financial Results."  The press release stated in pertinent part as follows:

> On December 22, 2008, the company announced a plan to exit all
> non-captive financial business.  As a consequence, in the quarter,

Textron recorded a number of special charges including a $293 million pre-tax mark-to-market adjustment against finance receivables held for sale, a $169 million pre-tax impairment charge to eliminate Textron Financial Corporation's (TFC) goodwill and a $31 million tax charge related to the change in investment status of TFC's Canadian subsidiary. Textron also recorded a pre-tax restructuring charge of $64 million related to cost-saving initiatives across the enterprise.

93.     The press release also reported results by segments, stating in pertinent part as follows:

Segment Results
Cessna

Cessna's fourth quarter revenues and segment profit decreased $64 million and $90 million, respectively, compared with the fourth quarter of 2007. Revenues decreased in spite of the sale of more jet units, primarily reflecting a higher proportion of Mustang sales. This decrease was partially offset by higher pricing and the benefit from the acquisition of the Columbia single engine product lines.

Segment profit decreased due to used aircraft valuation adjustments, the impact from lower revenue mix, higher product development expense and overhead costs.

Cessna backlog at the end of the fourth quarter was $14.5 billion, up $1.9 billion from the end of last year.

***

Finance revenues decreased $64 million in the fourth quarter due to lower market interest rates, and lower securitization gains which were partially offset by the benefit of interest rate floors.

Segment profit decreased $171 million as a result of increased loan loss provisions, higher borrowing costs and lower securitization gains, partially offset by the benefit of interest rate floors.

Increased loan loss provisions reflected weakening general market conditions, declining collateral values and the lack of liquidity available to our borrowers and their customers. These provisions also incorporated estimates for an increase in expected credit losses resulting from TFC's exit plan.

Sixty-day plus delinquencies increased to 2.59% from 1.06% at the end of the third quarter. Nonperforming assets increased to 4.72% compared to 2.67% in the third quarter.

Managed receivables ended the year at $10.8 billion, versus $11.4 billion at the end of the third quarter.

94.     On this day, the price of Textron common stock declined by 32% to close at $9.09 per share.

95.     Textron also announced more job cuts after it announced its earnings results: "To date, the maker of Cessna jets, Bell helicopters and turf maintenance equipment, has announced plans to eliminate a total of about 6,200 positions, or nearly 15 percent of its global work force in recent months." *See* Daniel Lovering and Donna Borak, *Textron swings to 4Q loss, 2009 outlook dim,* AP, January 29, 2009.

96.     During a conference call with analysts Defendant Campbell stated that for the fourth quarter 2008 the Cessna Segment had 23 aircraft order cancellations and "an unprecedented number of deferrals." *See id.*

97.     Nicole Parent of Credit Suisse commented, "the forecast is much worse than we could have imagined.  The abysmal guidance reflects lower than expected deliveries at Cessna and weaker performance at the finance unit."

98.     Subsequent to the Class Period, S&P, Moody's and Fitch downgraded their ratings on Textron and rumors of liquidity concerns for the Company's Finance Segment were prevalent.

99.     As a consequence of the above facts, Defendants knew of or should have known that Textron was an imprudent investment for the Plan.  Their fiduciary duties notwithstanding, Defendants failed to protect the Plan participants' retirement savings from being imprudently

invested in Textron stock, and as a result, the Plan suffered losses, for which the Defendants are liable.

## MISMANAGEMENT OF THE PLAN'S ASSETS

100.    Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

101.    Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. § 1104(c), because (i) Plan participants did not exercise independent control over their accounts, (ii) Defendants subjected participants to improper influence with respect to the Plan's investments in Textron common stock, and (iii) Defendants concealed material non-public information concerning Textron that Defendants were not precluded from disclosing under applicable law.

102.    During the Class Period, Textron common stock was an imprudent Plan investment because, *inter alia*:

(a)    the Company overstated its financial condition and future prospects via its inflated backlog of unfilled orders in the Cessna Segment;

(b)    the Company failed to timely write down assets due to poor debt management, thereby causing the assets of the Finance Segment to be materially overstated;

(c)    the Company's credit rating would be negatively impacted as a result of material overstatements in the Finance Segment once this was publicly reported;

(d)    the Company lacked appropriate internal controls; and

(e)     as a result of the foregoing, the Company's financial projections were misleading and its prospects of generating future profits was uncertain.

103.   Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Textron stock was a prudent investment for the Plan; failed to develop appropriate investment guidelines for Textron stock; failed to divest the Plan of Textron stock; failed to discontinue further contributions of Textron stock to the Plan; failed to remove or take other similar action Textron stock as an investment option for the Plan; failed to either properly consult or appoint independent fiduciaries regarding the appropriateness of an investment in Textron stock; and failed to resign as fiduciaries of the Plan if as a result of their employment by Textron, they could not loyally serve the Plan and its participants.   In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even though they knew or should have known that Textron's financial projections were materially overstated due to Textron's backlog of unfulfilled orders in the Cessna Segment and the deterioration of assets in its Finance Segment, resulting in a decrease in the value of Textron stock.

104.   Further, Defendants breached their fiduciary duties by direct and indirect communications with the Plan's participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate.   These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Textron's earnings, and Textron's financial stability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were incorporated into plan documents disseminated to the Plan's

participants: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Textron's annual reports, and the Plan's annual report on SEC Forms 11-K.

105.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

106.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Textron common stock during the Class Period.

107.    As a consequence of the Defendants' failures to act prudently, the Defendants caused significant losses to the Plan.

108.    The Plan suffered millions of dollars in principal losses because Defendants imprudently invested the Plan's assets in Textron stock during the Class Period in breach of Defendants' fiduciary duties.

109.    Defendants are liable for the Plan's losses because the Plan's investment in Textron stock were a result of Defendants' decision to imprudently maintain the assets of the Plan in Textron stock.  Thus, Defendants are liable for these losses because they failed to take the necessary, appropriate and required steps to ensure effective and informed independent participant control over the investment and decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

110.    Defendants withheld material, non-public facts from Plan participants and provided inaccurate and incomplete information to them regarding the true health and ongoing

29

profitability of Textron and its soundness as an investment vehicle.  As a consequence, Plan participants did not exercise independent control over their investments in Textron stock, and Defendants remain liable under ERISA for losses caused by such investment.

111.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including monitoring and removal of fiduciaries who failed to satisfy ERISA-mandated duties of prudence and loyalty, and eliminating Textron stock as an investment alternative when it became imprudent, the Plan would have avoided some or all of the losses that they, and indirectly the participants, suffered by continuing to invest in Textron stock.

112.    Plaintiff, on behalf of the Plan, seeks alternative types of relief under ERISA.

113.    First, with respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in Textron stock would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.  Accordingly, Plaintiff, on behalf of the Plan, seeks lost profits as a result of Defendants' breaches.  In particular, Plaintiff, on behalf of the Plan, seeks the profit that had been lost by investing in Textron stock instead of investing in other prudent funds within the Plan that were available at the time and which have outperformed the returns on Textron stock.

114.    Second, Plaintiff, on behalf of the Plan, seeks to recover the losses incurred by investing her retirement funds in Textron stock when Textron stock was a risky and imprudent investment.

115.    Third, Plaintiff, on behalf of the Plan, seeks a constructive trust -- both individually and on behalf of the Plan -- over all amounts by which the Plan's fiduciaries benefited as a result of their breaches.  In particular, Plaintiff seeks to impose a constructive trust on the amounts received by Defendants for selling their Textron stock, including amounts that certain Defendants received when they sold Textron stock at the same time that those Defendants were causing the Plan to use Plan assets to acquire and hold that stock.

116.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

117.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

## COUNT I

### Failure to Prudently and Loyally
### Manage the Plan and the Plan's Assets

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 Against All Defendants)

118.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119.    At all relevant times, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

120.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the Plan or disposition of the assets of the Plan and were, during the Class Period, responsible for ensuring that the Plan's investment options, including the Textron Stock Fund, made available to the Plan participants, were prudent and are liable for losses incurred as a result of the imprudence of such investments.

121.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

122.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

123.   According to ERISA § 404, a fiduciary's investment or investment course of action is prudent if: a) he or she has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the Plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he or she has acted accordingly.  "Appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  – The composition of the portfolio with regard to diversification;

  – The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  – The projected return of the portfolio relative to the funding objectives of the plan.

124.    Given the mismanagement of the Company as discussed herein, Defendants did not act prudently when they continued to invest the Plan's assets in Textron stock because, among other reasons:

        (a)    the Company overstated its financial condition and future prospects via its inflated backlog of unfilled orders in the Cessna Segment;

        (b)    the Company failed to timely write down assets due to poor debt management, thereby causing the assets of the Finance Segment to be materially overstated;

        (c)    the Company's credit rating would be negatively impacted as a result of material overstatements in the Finance Segment once this was publicly reported;

        (d)    the Company lacked appropriate internal controls; and

        (e)    as a result of the foregoing, the Company's financial projections were misleading and its prospects of generating future profits was uncertain.

125.    The participation in and knowledge of Textron's mismanagement as alleged herein is imputed and attributed to each Defendant.

126.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that Textron stock was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, Defendants continued to invest the Plan's assets in Textron stock and to direct and approve the ongoing, automatic investment of the future Company contributions in Textron stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Textron stock

127.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan's participants and beneficiaries, lost a significant portion of their retirement investment.

128.   Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Monitor Fiduciaries

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Textron and the Board Defendants)

129.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

130.   This Count alleges fiduciary breach against Defendant Textron and the Director Defendants (the "Monitoring Defendants").

131.   As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

132.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries of the Plan, including the members of any Plan Committees.

133.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and

holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

134.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

135.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

136.   Here, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Textron stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their respective plan accounts.

137.   In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about

the financial condition and practices of Textron that they indisputably knew or should have known, that the monitored Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

138.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, they enabled the breaches by these Defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

139.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement investment.

140.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III
### Breach of Duty to Avoid Conflicts of Interest

### (Breaches of Fiduciary Duties in Violation of ERISA § 404)

141.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    At all relevant times, as alleged above, the Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

143.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

144.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

145.   Upon information and belief, because the compensation of many of the Defendants was significantly tied to the price of Textron stock, Defendants had an incentive to keep the Plan's assets heavily invested in Textron stock on a regular, ongoing basis. Elimination of Company Stock as an investment option would have reduced the overall market demand for Textron stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Textron stock, resulting in lower compensation for the Defendants.

146.   During the Class Period, Defendant Campbell sold personally held shares of Company stock with a value in excess of $52 million.

147.   Some Defendants may have had no choice in tying their compensation to Textron stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Textron stock.

148.   These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

149.    Defendants placed their own interests in investing the Plan's assets in Textron stock over the Plan's participants' interest in maintaining a prudently invested ERISA plan.

150.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**
**Co-Fiduciary Liability**

**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

151.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

152.    This Count alleges co-fiduciary liability against all Defendants.

153.    As alleged above, during the Class Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

154.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

155.    ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the

breach. Here, the Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

156.   Textron, through its directors and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Textron as a matter of law.

157.   The Board Defendants, by virtue of their positions at Textron, participated in and/or knew about the Company's inappropriate business practices, and their consequences, including the resulting imprudence of Textron stock as an investment for the Plan's assets.

158.   Because the Defendants knew of the Company's improper business practices, they also knew that the Administrator Defendants were breaching their duties by continuing to invest the Plan's assets in Textron stock when it was no longer prudent to do so, and providing incomplete and inaccurate information to Plan participants. Yet, the Defendants failed to undertake any effort to remedy these breaches. Instead, they compounded them by obfuscating the risk that the Company's improper business activities posed to Textron, and, thus, to the Plan.

159.   ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Upon information and belief, Textron knowingly participated in the fiduciary breaches of the Administrator Defendants. Textron also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants. Likewise, the Board Defendants knowingly participated in the breaches of the Administrator Defendants because, as alleged above, they had actual knowledge of the

Company's improper conduct and yet, ignoring their oversight responsibilities, permitted the Administrator Defendants to breach their duties.

160.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

161.    The failure of Defendants to monitor the Administrator Defendants enabled them to breach their duties.

162.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement savings.

163.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the

Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had their accounts invested in the common stock of Textron maintained by the Plan in proportion to the accounts' losses attributable to the precipitous decline in the stock of Textron equity;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plan to ensure against further violations of ERISA.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

Dated:  September 10, 2009

MOTLEY RICE LLC

By: _____

Vincent L. Greene IV (#5971)
321 South Maine Street
Providence, RI  02903
Telephone:  (401) 457-7700
Facsimile:  (401) 457-7708

**MILBERG LLP**
Lori G. Feldman
Arvind B. Khurana
Sara E. Fuks
One Pennsylvania Plaza
New York, NY 10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

*Attorneys for Plaintiff Alma I. Perez*

43